# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

Jared Allen, *et al.*,

      Plaintiffs,             :      Case No.  2:19-cv-3709

      v.                           Judge Sarah D. Morrison
                                     Magistrate Judge Chelsey M. Vascura

Ohio Civil Service Employees
Association AFSCME, Local 11, *et al.*,    :

      Defendants.

## OPINION AND ORDER

This matter is before the Court on a Motion to Dismiss filed by Defendants Governor

Mike DeWine and Director Matthew Damschroder (the "State Defendants") (ECF No. 15) and

on Plaintiffs' Motion for Preliminary Injunction (ECF No. 20). Plaintiffs filed an Opposition to

the Motion to Dismiss (ECF No. 19), and the State Defendants filed a Reply (ECF No. 36). All

of the defendants filed Responses to the Motion for Preliminary Injunction (ECF Nos. 37, 38[1]),

and Plaintiffs have filed a Reply (ECF No. 41). These matters are now ripe for consideration.

## I.      BACKGROUND

Plaintiffs Jared Allen, Christina Cole, Eric Hendrickson, and Jeremy Dunaway work for

the State of Ohio. (Compl. ¶ 11, ECF No. 1.) Each was given the option to join or not join the

union representing State of Ohio employees, Defendant Ohio Civil Service Employees

Association ("OCSEA"). (*Id.* ¶ 14.) Each plaintiff opted to join OCSEA at some point during

his/her tenure. (Christopher Mabe Decl. Exs. 1B–1E, ECF No. 37-1.)

To join OCSEA, a State of Ohio employee must sign a dues deduction form (the

"Checkoff Agreement"). (Mabe Decl. ¶ 4.) The top part of the version of the Checkoff

---

[1] The State later filed a brief supplement to its response. (ECF No. 40.)

Agreements signed by Plaintiffs (the "OCSEA Checkoff Agreement")[2] contains the following language: "I hereby authorize the State of Ohio to make this change to the [v]oluntary [d]eductions from my earnings" followed by a checked box authorizing the dues deduction. (Kristen Rankin Decl. Ex. 1–2, ECF No. 15-1.) The bottom part of the OCSEA Checkoff Agreements, which Plaintiffs also signed, says: "I request and accept membership in OCSEA. I agree that my membership shall be in accordance with the provisions of the Constitution of OCSEA and AFSCME and its subordinate bodies, as well as the collective bargaining agreement ["CBA"] negotiated between OCSEA and my employer."[3] (Mabe Decl. Ex. 1A–1E.) Plaintiffs each signed an OCSEA Checkoff Agreement on or before February 17, 2016. (*Id.*)

Over 30,000 State employees have become union members by signing a Checkoff Agreement and joining OCSEA. (Compl. ¶ 10.) Once in the union, members have the right to participate in union meetings, vote in union officer elections, and vote on the ratification of the CBA. (Mabe Decl. ¶ 5.) Members also receive commercial discounts through the AFSCME Advantage program and can participate in the AFSCME Free College program, which entitles union members and their families to obtain an  associate's degree at no cost. (*Id.* ¶ 6.)

The CBA is a contract between the State and OCSEA[4], and all members are subject to its terms. (Mabe Decl. Ex. 1A.) The relevant CBA went into effect on May 12, 2018, and continues through February 28, 2021. (Compl. Ex. A, at 2, ECF No. 2.) The CBA is signed by

---

[2] Ohio has also adopted a second Checkoff Agreement (the "Alternative Checkoff Agreement"). The circumstances in which the Alternative Checkoff Agreement has been used are not clear. However, based on the information that Plaintiffs have provided, the language on the Alternative Checkoff Agreement is different from the language on the OCSEA Checkoff Agreement. (Compl. Ex. B, ECF No. 2.)

[3] Mr. Dunaway's Checkoff Agreement appears to have a typographical error at the end of the last sentence, and it says " . . . collective bargaining agreement negotiated s [sic] OCSEA and my employer." (Mabe Decl. Ex. 1D, ECF No. 37-1.) No party has argued that this difference is material, so the Court does not treat it as such.

[4] Contract 1 (2018), https://serb.ohio.gov/static/PDF/Contracts/2017/17-MED-11-1423.pdf.

representatives of OCSEA and of the State, including the Governor and the Director of the Department of Administrative Services ("DAS").[5] Contract 160. The Governor is the State's chief executive officer. (Compl. ¶ 4.) In turn, DAS "is responsible for payroll processing and making payroll deductions from State employees' wages," and it is also responsible for overseeing administration of the CBA. (*Id.* ¶ 5; Rankin Decl. ¶ 2.)

Section 4.01 of the CBA requires the State to deduct biweekly membership dues, payable to OCSEA, after an employee signs a Checkoff Agreement. (Compl. Ex. A, at 24–25.) Ohio law requires all CBAs to include a provision that "[a]uthorizes the public employer to deduct the periodic dues, initiation fees, and assessments of members of the exclusive representative upon presentation of a written deduction authorization by the employee." Ohio Rev. Code Ann. § 4117.09(B)(2) (West 2020).

Section 4.02 of the CBA obligated the State to deduct agency fees from the paychecks of state employees who had not signed a Checkoff Agreement and tender those fees to OCSEA. (Compl. Ex. A, at 25.) On June 27, 2018, the Supreme Court voided mandatory agency fee provisions like Section 4.02. *See Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2460 (2018). In response, Defendants ceased their enforcement of Section 4.02 as of June 27, 2018. (Compl. ¶ 22.)

Section 4.03 (the "Maintenance of Membership Requirement") requires all members, "as a condition of employment," to remain members of OCSEA for the duration of the CBA. (*Id.* Ex. A, at 25.) Those wishing to terminate their membership may only do so by providing written

[5] The parties agree that although the entire CBA was not attached to the Complaint, it should be considered to be part of the pleadings. (*See* State Def. Mot to Dismiss, at 1, ECF No. 15; Pl. Resp. to Mot. to Dismiss, at 2, ECF No. 19.)

notice to OCSEA between December 30, 2020, and January 29, 2021 (the "Withdrawal Window"). (*Id.*)

Beginning around July 2018 and at various times thereafter, Plaintiffs made requests to the State and to OCSEA to withdraw from the union and cease withdrawal of their dues money. (*Id.* ¶¶ 31–38.) Their withdrawal attempts were unsuccessful. (*Id.*)

On August 27, 2019, Plaintiffs sued OCSEA, Governor Mike DeWine, and DAS Director Matthew Damschroder. (*See generally id.*) In their Complaint, Plaintiffs allege that *Janus* established a right to not have union dues and fees deducted from government employees' wages without their affirmative consent. (*Id.* ¶ 54.) Plaintiffs further allege that they have not affirmatively consented to have union dues deducted from their wages and that they did not "voluntarily, knowingly, and intelligently waive[] their First Amendment rights not to subsidize OCSEA's speech" when they joined OCSEA. (*Id.* ¶¶ 55–56.) Specifically, Plaintiffs allege that the OCSEA Checkoff Agreements that they signed do not constitute valid waivers of these rights. (*Id.* ¶ 56.)

Plaintiffs have proposed a class action seeking the following relief: declaratory judgments that it violates the First Amendment to maintain and enforce aspects of the CBA or to enforce Section 4.01 or ORC § 4117.09(B)(2) against a member without clear and compelling evidence of a waiver of First Amendment rights; an injunction that Defendants cannot engage in conduct declared unconstitutional; compensatory damages; nominal damages; costs and fees; and equitable relief requiring Defendants to give Plaintiffs and members of the putative classes written notice about particular aspects of the CBA. (*Id.* at 16–17.) On December 27, 2019, Plaintiffs filed a Motion for Preliminary Injunction, seeking an order preventing Defendants

from enforcing Sections 4.01 or 4.03 against Plaintiffs or members of the putative classes. (Pl. Mot. Prelim. Injunction, at 1–2, ECF No. 20.)

Effective January 10, 2020, the State ceased Plaintiffs' dues deductions. (Mabe Decl. ¶ 21.) In addition, in January 2020, OCSEA refunded Plaintiffs all of their dues payments with interest, retroactive to the date they communicated their intent to withdraw from the union and cease the dues deductions. (*Id.* ¶¶ 19, 21.) However, as of this time, Plaintiffs have not cashed these refund checks. (Pl. Reply to Mot. Prelim. Injunction, at 5, ECF No. 41.)

## II. MOTION TO DISMISS

The Court first addresses the State's Motion to Dismiss for lack of jurisdiction, because if this Court lacks jurisdiction, it can go no further. *See Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 593 (2004) ("[I]t is the obligation of both [the] district court and counsel to be alert to jurisdictional requirements.").

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal when the court lacks subject matter jurisdiction. Without subject matter jurisdiction, a federal court lacks authority to hear a case. *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1133 (6th Cir. 1990). Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack under Rule 12(b)(1) "questions merely the sufficiency of the pleading[,]" and the trial court therefore takes the allegations of the complaint as true. *Wayside Church v. Van Buren Cty.*, 847 F.3d 812, 816 (6th Cir. 2017) (internal quotation marks omitted). To survive a facial attack, the complaint must contain a short and plain statement of the grounds for jurisdiction. *Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016). A factual attack is a challenge to the factual existence of

subject matter jurisdiction, in which case no presumptive truthfulness applies to the factual allegations. *Ritchie*, 15 F.3d at 598. In the context of a factual attack, a reviewing court may weigh the evidence in order to satisfy itself as to the existence of its power to hear the case. *Id.*

When subject matter jurisdiction is challenged, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

**B.    Analysis**

The State Defendants have moved to dismiss for lack of subject matter jurisdiction on the grounds of sovereign immunity and mootness. (State Def. Mot. to Dismiss, ECF No. 15; State Resp. to Pl. Mot. Prelim. Injunction, ECF No. 38.) This appears to be a combined facial and factual attack. Plaintiffs contest dismissal on both grounds.

**1.    Sovereign Immunity**

Lawsuits against state officials in their official capacity are suits against the officials' offices, not the officials themselves, and are therefore subject to being barred by sovereign immunity. *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 598 (6th Cir. 2016). Sovereign immunity does not apply in three situations—1) when the state has consented to being sued, 2) when the *Ex parte Young* exception applies, and 3) when Congress has abrogated a state's immunity. *Id.* The parties agree that the only potentially applicable exception is the *Ex parte Young* exception, so if it does not apply, the State Defendants are entitled to dismissal.

The *Ex parte Young* exception allows for a court to "issue prospective injunctive and declaratory relief compelling a state official to comply with federal law . . . ." *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008). However, that "officer must have some connection with the enforcement of the act, or else it is merely making him a party as representative of the

state, and thereby [impermissibly] attempting to make the state a party." *Ex parte Young*, 209 U.S. 123, 157 (1908); *accord Floyd v. Cty. of Kent*, 454 F. App'x 493, 499 (6th Cir. 2012) ("The state official sued, however, must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains."). Accordingly, the "plaintiff must allege facts showing how a state official is connected to, or has responsibility for, the alleged constitutional violations." *Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013).

The Court agrees with Plaintiffs that the State Defendants have sufficient connection with the dues deductions to come within the *Ex parte Young* exception for two reasons. First, the State Defendants have signed the CBA on behalf of the State. In doing so, they are parties to the CBA (in their official capacities), they consented to its terms, and they agreed to be bound by its terms. They cannot agree to the terms of the CBA and agree to be bound by them but then later disclaim any role in the CBA's administration or enforcement. This is particularly true for the DAS Director, since DAS is responsible for overseeing administration of the CBA.

That does not necessarily mean that every signatory on behalf of the State is responsible for enforcing every provision of the CBA and would be a proper party to a lawsuit arising from the CBA. However, Plaintiffs have alleged sufficient facts that the State Defendants have the requisite responsibility to be subject to suit, at least in these circumstances. The Governor is the top-line signatory on the CBA, and, as the chief executive officer of the State, he is in charge of the State's workforce. Thus, it is the Governor who is ultimately responsible for enforcing the terms of employment of his workforce, which include the Maintenance of Membership Requirement. The DAS Director is the second-line signatory and the head of the governmental department responsible for overseeing administration of the CBA. It is he who oversees, and is

responsible for, DAS's compliance with Sections 4.01 and 4.03. These allegations regarding the State Defendants' responsibilities are sufficient to survive a motion to dismiss.

Second, the State Defendants agreed that the State would undertake certain obligations under the CBA. Pursuant to Section 4.01, the State agreed to deduct biweekly membership dues from each member upon receipt of a signed Checkoff Agreement and to remit those dues to OCSEA. The State not only agreed to this provision but *required* it. *See* Ohio Rev. Code Ann. § 4117.09(B)(2).

The State also agreed to Section 4.03; because Section 4.03 requires that union membership be maintained for the duration of the CBA "as a condition of employment," this provision must necessarily be enforced by the State, which, as the employer, is the only entity able to enforce terms of its employees' employment. Without the assistance of the State, it would be impossible for the Union to enforce these two provisions. *See Smith v. Teamsters Local 2010*, No. CV 19-00771-PA, 2019 WL 6647935, at *4 (C.D. Cal. Dec. 3, 2019) (denying Motion for Judgment on the Pleadings based on sovereign immunity because allegation in Complaint that state law required State Controller to deduct dues constituted "direct[] involve[ment] in executing the dues deductions"); *O'Callaghan v. Regents of Univ. of Cal.*, No. CV 19-2289, 2019 WL 6330686, at *5–6 (C.D. Cal. Sept. 30, 2019) (holding that union had acted jointly with the state and that the state had facilitated the allegedly unconstitutional conduct by its involvement with the union). *But see, e.g.*, *Mendez v. Cal. Teachers Ass'n*, No. 19-cv-01290, 2020 WL 256124, at *2–3 (N.D. Cal. Jan. 16, 2020) (finding that California law authorizing dues deductions "does no more than set forth an administrative, ministerial mechanism for carrying out a deduction from the wages of those individuals who voluntarily elected to become union members and authorized deduction of their union dues from their paychecks" and that the State

"play[ed] no role in enforcing union membership agreements or setting their terms"). Indeed, the State is contractually obligated to enforce these provisions as a party to the CBA.

In arguing that sovereign immunity applies, the State primarily relies on two Sixth Circuit cases. In the first, *Children's Healthcare is a Legal Duty, Inc. v. Deters*, the court held that the Ohio attorney general was not a proper party to the lawsuit because she had not enforced or threatened to enforce the statute at issue against the plaintiffs. 92 F.3d 1412, 1416 (6th Cir. 1996). The State concludes from this case and others that the State Defendants are not proper parties because they have not "enforced" or "threatened to enforce" § 4117.09(B)(2) or the CBA because they have not "initiated proceedings" against Plaintiffs or threatened to do so. (ECF No. 15, at 11, 14–15.) However, *Deters* does not stand for the proposition that "enforcing" a statute means only that a state defendant has sued or threatened to sue pursuant to that statute. Rather, to "enforce" is "[t]o give force or effect to" or "to compel obedience to" something. *Enforce*, Black's Law Dictionary (10th ed. 2014). That is broader than litigation. In this case, the State Defendants have given force or effect to, and have compelled obedience to, the statute and the CBA by signing onto the CBA and continuing to enforce its provisions.

The State also relies on *Top Flight Entertainment, Ltd. v. Schuette* in which the Sixth Circuit considered a lawsuit brought against the Michigan Governor and Lottery Commissioner (the "Commissioner") that arose out of the Commissioner's distribution of licenses. 729 F.3d at 628–29. The court found that the Governor was not an appropriate defendant because he had no personal involvement in the licensing process but that the Commissioner was properly sued because he had the statutory power to grant or deny licenses. *Id.* at 634. This case is also distinguishable. As parties to the CBA, the Governor and the DAS Director were personally

involved in enforcing the CBA provisions at issue here, just as the Commissioner was in *Top Flight*.

While the State may not have discretion or control over an employee's decision to join OCSEA or authorize dues deductions, its role in the deduction of the union dues is more than that of a purely administrative intermediary between OCSEA and its members. First, the State specifically undertook the contractual obligation to deduct these dues by agreeing to Section 4.01. Second, state law mandated that the contract include a provision like Section 4.01. Accordingly, the State has a responsibility independent of OCSEA to ensure that the CBA complies with the law. *See Weaver v. Univ. of Cincinnati*, 970 F.2d 1523, 1538 (6th Cir. 1992) ("[T]he university as a public employer had duties separate and apart from those of the union. Both parties to a fair share agreement must be held accountable for their responsibility to see that *Hudson*'s commands are followed."); *Cramer v. Matish*, No. 89-1885, 1990 WL 169640, at *4 (6th Cir. Nov. 2, 1990) ("[T]he public employer, not the union, has the primary duty to ensure that [a dues disclosure] plan is constitutionally valid."); *Lowary v. Lexington Local Bd. of Educ.*, 704 F. Supp. 1430, 1449 (N.D. Ohio 1987) ("[I]t is the government employer and the union who share the duty in establishing a constitutionally valid fair-share fee procedure.").[6] Regardless of its contractual obligations to OCSEA, the State cannot lawfully continue to enforce a law it knows to be illegal. *See Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (noting that qualified immunity does not cover public officials who knowingly violate the law).

### 2. Mootness

The State next argues that dismissal is warranted because Plaintiffs' claims are moot. Federal courts only have jurisdiction over "'actual, ongoing cases or controversies.'" *Wilson v.*

---

[6] While *Weaver*, *Cramer*, and *Lowary* are distinguishable from this case in some respects, these cases recognize that the State has its own duty to comply with the law, irrespective of the union.

*Gordon*, 822 F.3d 934, 941 (6th Cir. 2016) (quoting *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 595 (6th Cir. 2014)). Accordingly, "a case may become moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome . . . .'" *Id.* at 941–42 (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980)).

In the class action context, mooting the named plaintiffs' claims generally does not moot the action once a class is certified because the class has a separate legal status. *Id.* at 942. "'Where, on the other hand, the named plaintiff[s'] claim[s] become[] moot *before* certification,' the ordinary rule is that 'dismissal of the action is required.'" *Id.* (quoting *Brunet v. City of Columbus*, 1 F.3d 390, 399 (6th Cir. 1993)).

Nevertheless, there are exceptions to this ordinary rule, two of which are relevant here. The first, the "inherently transitory" exception, applies if 1) the injury is so "transitory" that it would likely evade review by becoming moot before the district court could rule on class certification and 2) it is certain that other class members are suffering the injury. *Id.* at 945. An injury is considered "transitory" if there is "uncertainty about how long an injury caused by ongoing conduct will persist . . . ." *Id.* The Sixth Circuit has applied the "inherently transitory" exception where the defendant holds the power to moot the injunctive relief sought by the plaintiffs, where it is in the defendant's discretion to decide when or if the requested relief should be provided, and where the defendant has the ability to provide relief (and potentially moot the case) "before the district court could reasonably be expected to rule on" a pending class certification motion. *See id.* at 947 (applying "inherently transitory" exception where plaintiffs sued for an injunction ordering Tennessee to make a determination on their Medicare claims and the state made the requested determinations while class certification motion was pending).

The second applicable exception is the "picking off" exception "where a defendant picks off named plaintiffs in a class action before the class is certified . . . ." *Id.* In the view of the Sixth Circuit, this exception becomes relevant at least once a class certification motion has been filed. *See id.* What matters in determining whether this exception applies is whether "the defendant is on notice that the named plaintiff[s] wish[] to proceed as a class, and . . . therefore might strategically seek to avoid that possibility . . . ." *Id.* Some cases have also blended these two exceptions, finding that claims could be considered transitory precisely because of "the fact that the defendant could pick off the named plaintiffs . . . before a motion for class certification could be ruled on." *Id.* at 948.

Both exceptions apply here. Beginning with the "inherently transitory" exception, here, as in *Wilson*, the ball is entirely in Defendants' court. Defendants have the capability to decide whether and when to provide relief to any of the putative class members, a capability that they have already employed with respect to Plaintiffs. Two weeks after Plaintiffs filed their motion for class certification, Defendants provided Plaintiffs with their requested relief. This is evidence that Defendants can moot any of the putative class members' claims at will, resulting in uncertainty about how long the asserted harm will persist and raising the possibility that the asserted harm could evade review by becoming moot before the Court could rule on class certification. That satisfies the first component of the "inherently transitory" exception. As for the second component, other putative class members are alleged to be suffering from the asserted harm. In fact, one of the putative classes is estimated at 30,000 people.

The "picking off" exception applies too. Defendants were on notice that Plaintiffs wished to proceed as a class, and two weeks later they gave Plaintiffs their requested relief. Defendants could continue to do so in perpetuity with respect to other members of the putative classes. They

could continue to pick off any named plaintiffs one by one until none remained. That is exactly what *Wilson* disallowed.

The State Defendants cannot invoke sovereign immunity in this matter, and the case is not moot. The State Defendants' Motion to Dismiss is **DENIED**.

## III. MOTION FOR PRELIMINARY INJUNCTION

### A. Standard of Review

The Court must consider four factors in determining whether to issue a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable harm; (3) whether the preliminary injunction would substantially harm third parties; and (4) whether the preliminary injunction would serve the public interest. *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). These four factors are not prerequisites, but rather they are to be balanced. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). However, in the First Amendment context, "the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). This is because the "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,'" *id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)), and "because 'it is always in the public interest to prevent the violation of a party's constitutional rights,'" *id.* (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

### B. Analysis

#### 1. Likelihood of Success on the Merits

In support of their Motion for Preliminary Injunction, Plaintiffs argue that they and the putative class members did not knowingly, intelligently, and voluntarily waive their First

Amendment rights and that the post-*Janus* union dues deductions thus violate the First Amendment. Defendants argue that Plaintiffs are not likely to succeed on the merits of their claims on the grounds of mootness. For the reasons discussed above, this case is not moot.

Defendants next argue that Plaintiffs' claims are are not likely to succeed because Plaintiffs waived their First Amendment rights by signing the OCSEA Checkoff Agreements. A waiver of constitutional rights must be voluntarily, intelligently, and knowingly made. *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 226 (6th Cir. 2007), *abrogated on other grounds*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). This is the same standard as applies in criminal proceedings. *Id.* A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Waiver of a constitutional right must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* A First Amendment waiver must be proven by clear and compelling evidence. *Janus*, 138 S. Ct. at 2486. In the union fees context, a valid First Amendment waiver requires "clear[] and affirmative[]" consent by an employee before any of his/her dues are deducted. *Id.* It is Plaintiffs' burden to prove that their waiver was not knowing and voluntary. *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752, 758 (6th Cir. 1985).

Before analyzing the validity of Plaintiffs' purported waivers, it is necessary to identify the First Amendment rights specifically at issue here. Plaintiffs frame the right as the "right to not subsidize OCSEA and its speech" as recognized in *Janus*. (ECF No. 20, at 4.) However, Plaintiffs frame the right too broadly, because they ignore the fact that they signed the OCSEA Checkoff Agreements and agreed to join and pay dues to OCSEA. Because Plaintiffs opted to join and pay dues to the union, the properly framed right at issue here is not whether Plaintiffs

have the right to not subsidize OCSEA's speech but whether they have a right to tear up those contracts.

Plaintiffs were not required to join the union, a right that has been recognized in federal labor law since at least 1974. *See* 29 U.S.C. § 158(a)(3) (1976) ("It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."); *Smith v. Superior Ct., Cty. of Contra Costa*, No. 18-CV-05472-VC, 2018 WL 6072806, at *1 (N.D. Cal. Nov. 16, 2018) ("Smith's First Amendment right to opt out of union membership was clarified in 1977, and yet he waived that right by affirmatively consenting to be a member of Local 2700."). Yet, at various points in their tenure, Plaintiffs affirmatively decided to join OCSEA and to have union dues deducted from their paychecks. While Plaintiffs now try to disaggregate the decision to join the union from the decision to subsidize the union's speech, it is impossible to do so. By joining the union, Plaintiffs simultaneously acquired all of the benefits and burdens of membership. In doing so, they voluntarily forfeited the right to object to how the union used their money.

*Janus* does not require a different result. *Janus* analyzed the rights of individuals who *declined* to join a union but were nevertheless required to pay agency fees. 138 S. Ct. at 2461. *Janus* was explicit in "draw[ing] the line at allowing the government to . . . *require all employees* to support the union . . . ." *Id.* at 2478 (emphasis added). *Janus* was also explicit in stating that "[s]tates can keep their labor-relations systems exactly as they are—only they cannot force *nonmembers* to subsidize public-sector unions." *Id.* at 2485 n.27 (emphasis added).

Plaintiffs respond by saying that they are now "nonmembers," so *Janus* should apply to them. (ECF No. 41, at 7.) But they are not "nonmembers" as the term was used in *Janus*. As

discussed, Plaintiffs consented to becoming union members, paying dues, and abiding by the CBA, which required the maintenance of union membership and payment of dues for the duration of the CBA. That consent has not been erased by virtue of their withdrawal from the union. Even the fact that the union has allowed them to withdraw does not mean that the union is no longer entitled to enforce any provisions of the contract against other members of the putative classes. In reading *Janus* as a whole, it is clear that the core distinction that the Court drew was not between members and nonmembers but between consenters and nonconsenters. *Janus* explicitly stated that union dues were permitted where an "employee affirmatively consents to pay" and that "[b]y agreeing to pay, [even] *nonmembers* are waiving their First Amendment rights . . . ." *Id.* at 2486 (emphasis added). Plaintiffs consented to pay dues to the union for at least a specific term, regardless of the status of their membership. Because *Janus* dealt with the rights of nonconsenters, it says little about the scope of the rights of consenters like Plaintiffs.

Even assuming that *Janus*'s change in the constitutional landscape gave rise to a newly recognized right that was relevant to Plaintiffs' circumstances, that does not mean that Plaintiffs can use that new right to renege on the terms of the contract that they signed. *See Smith v. Bieker*, No. 18-cv-05472-VC, 2019 WL 2476679, at *2 (N.D. Cal. June 13, 2019) ("[C]hanges in intervening law—even constitutional law—do not invalidate a contract."); *cf. Brady v. United States*, 397 U.S. 742, 757 (1970) ("[A] voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise."). Plaintiffs have not identified any cases where an individual voluntarily entered into a contract with full information as to the rights he/she was giving up, waived those rights, and subsequently was permitted to break that contract based on a change in the law applicable to those rights. They rely primarily on a Sixth Circuit case involving a

restaurant's agreement to change its name; that case, while relevant to the question of what constitutes a valid First Amendment waiver, does not stand for the proposition that newly recognized First Amendment rights can vitiate a preexisting contract.

In 1971, Sambo's Restaurant applied to the Ann Arbor, Michigan, city council for permission to build a restaurant. *Sambo's Rests., Inc. v. City of Ann Arbor*, 663 F.2d 686, 687 (6th Cir. 1981). Some members of the city council thought the restaurant's name was offensive and had reservations about the permit application. *Id.* at 688. In 1972, in order to appease the city (and on the belief that its application would otherwise be rejected), Sambo's agreed to build the restaurant under a different name. *Id.* The application was approved, and the restaurant was built under the different name. *Id.* In 1978, the restaurant sought to change its name back to Sambo's and sued the city on the grounds that the limitation on its name in the 1972 agreement was a First Amendment violation. *Id.* at 688–89.

In determining whether Sambo's had waived its First Amendment rights in the 1972 agreement, the Sixth Circuit determined that the waiver of a federal right is a question of federal law, not a question of state law. *Id.* at 690. However, the court found it necessary to consider state contract law to determine the validity of the 1972 agreement. *See id.* at 691. That is, the court specifically found that the 1972 agreement did not contain sufficient consideration to constitute a contract (and thus to allow for a finding of waiver) because Sambo's had not received any benefit when it agreed to change the restaurant's name. *Id.* The only benefit the restaurant received was approval of the site plan, which did not constitute adequate consideration because approval of the site plan was required by law. *Id.*

The *Sambo's* court also considered the fact that Sambo's had no First Amendment rights to exercise in 1972 because the Supreme Court did not recognize commercial speech as being

protected by the First Amendment until 1976. *See id.* at 692. Thus, the court reasoned, because Sambo's had no recognized First Amendment right to choose the name of its restaurant in 1972, it could not have waived that then-unrecognized right. *Id.* at 693.

Plaintiffs argue that *Sambo's* unconditionally supports their arguments that they could not knowingly and intelligently waive their right not to participate in the union before *Janus* was decided. This is wrong for two reasons. First, the holding in *Sambo's* was explicitly based on a finding that Sambo's had not received adequate consideration to change the name of the restaurant, because the restaurant's agreement to do so was "unilateral" and "gratuitous" and therefore was not a binding agreement. *See id.* at 691–92.[7] A finding of a valid contract was a necessary prerequisite to considering the waiver issue. Second, while *Sambo's* also reasoned that a constitutional right cannot be waived before it was recognized, this principle offers no benefit to Plaintiffs because, as explained above, the First Amendment right recognized by *Janus* has no bearing on those who voluntarily consented to join a union as Plaintiffs did.

At bottom, what Plaintiffs argue is that they did not have all of the information that might have been useful to them in deciding between their two options—to join or not join the union. That is, at the time they chose to sign the OCSEA Checkoff Agreement, they did not know that if they opted instead to pay the agency fees, those fees would later be declared unconstitutional and they could have avoided having to pay anything at all. However, the Constitution does not require that an individual be provided "with a flow of information to help him calibrate his self-interest in deciding whether to . . . stand by his rights." *Moran*, 475 U.S. at 422; *see Colorado v.*

---

[7] Plaintiffs argue that *Sambo's* explicitly disclaimed any reliance on state contract law. (ECF No. 41, at 8.) It did not. The court held that a legally valid agreement under state contract law would not necessarily be adequate to waive a federal right. *See Sambo's*, 663 F.2d at 690. The court then conducted a lengthy analysis explaining that, because there was no consideration for the restaurant's agreement to change its name, Sambo's never entered into a valid contract to waive its First Amendment rights. *See id.* at 690–92. This analysis would have been superfluous if Plaintiffs' interpretation were correct.

*Spring*, 479 U.S. 564, 573–74 (1987) (finding *Miranda* waiver where defendant understood his

*Miranda* rights even if he did not "know and understand every possible consequence of a waiver

of the Fifth Amendment privilege"); *Brady*, 397 U.S. at 757 ("The rule that a plea must be

intelligently made to be valid does not require that a plea be vulnerable to later attack if the

defendant did not correctly assess every relevant factor entering his decision."). Plaintiffs here

were informed as to the "essential nature" of the right that they were giving up (to not join the

union). *See Bousley v. United States*, 523 U.S. 614, 619 (1998). That Plaintiffs may not have

correctly assessed every relevant factor to their decisions (e.g., the likelihood that agency fees

would be deemed unconstitutional) is irrelevant to evaluating the voluntariness of their decision.

*See Belgau v. Inslee*, 359 F. Supp. 3d 1000, 1016–17 (W.D. Wash. 2019) ("The notion that the

Plaintiffs may have made a different choice if they knew 'the Supreme Court would later

invalidate public employee agency fee arrangements [in *Janus*] does not void' their previous

knowing agreements." (alteration in original) (quoting *Cooley v. Cal. Statewide Law Enf't Ass'n*,

No. 2:18-cv-02961-JAM-AC, 2019 WL 331170, at *3 (E.D. Cal. Jan. 25, 2019))).

Plaintiffs also argue that their choice to join the union was effectively coerced because

the alternative option would have been to pay the agency fee requirement. However, the fact that

Plaintiffs did not like the two choices with which they were presented does not mean that they

did not have the opportunity to choose freely between these two available alternatives.

Ohio state employees who chose to join the union signed the OCSEA Checkoff

Agreement and expressly agreed 1) to join OCSEA, 2) to authorize that union dues be deducted

from their pay for remittance to OCSEA, and 3) to abide by the terms of the CBA. Plaintiffs

were free to not join the union. That is all that is required by the First Amendment. *See Knox v.

Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 321 (2012). It is true that had they not done

so, they would have been required to pay agency fees to OCSEA, as required by the CBA and permitted by then-governing law, but they did not have to join OCSEA or pay full union dues. Plaintiffs made a free and deliberate choice to opt into the union, pay full dues, and reap all of the benefits of that choice.

Plaintiffs present no evidence of any intimidation, coercion, or deception that would render their choice to join the union involuntary. However, to the extent that Plaintiffs feel OCSEA acted improperly, they are free to bring a claim under state contract law. *See Mendez*, 2020 WL 256124, at *3. Plaintiffs joined the union with a full awareness of "the nature of the right being abandoned" (the right not to join the union) and "the consequences of the decision to abandon it" (paying full union dues and being bound by the terms of the CBA). The Constitution requires nothing more.

Plaintiffs also attack the OCSEA Checkoff Agreement as being insufficiently informative or clear to constitute a waiver of their rights. It is not entirely clear what language Plaintiffs would consider to be adequate to constitute a waiver, but it appears that they would have preferred the OCSEA Checkoff Agreement to have said something along the lines of: "You have a First Amendment right not to join OCSEA or have union dues deducted." (*See* ECF No. 20, at 11.) However, the case law does not require such specificity. For example, in *D.H. Overmyer Co. of Ohio v. Frick Co.*, the parties signed a contract whereby D.H. Overmyer agreed that in the event it defaulted on its payments under the contract, it would waive service of process and Frick would be entitled to a default judgment. 405 U.S. 174, 180–81 (1972). The waiver never identified the Fourteenth Amendment as the source of the right to service of process, it never told D.H. Overmyer that it had a right to notice and an opportunity to be heard, and it never stated that the company had a right to due process under the Fourteenth Amendment. *See id.* at 180–81.

It merely said that the parties agreed that D.H. Overmyer would "waive this issuance and service of process, and confess a judgment . . . ." *Id.* at 180. Nevertheless, the Supreme Court found this statement to be sufficient warning to establish waiver. *Id.* at 185–87. This basic warning is similar in all relevant respects to the waiver provision at issue here in that it identified what exactly was being given up in signing the contract. All that Plaintiffs were required to be apprised of and to waive was the *nature of* the right (here, not joining the union), not the constitutional foundation for it.

To the extent Plaintiffs' argument relies on the fact that the OCSEA Checkoff Agreement does not explicitly say "You do not have to join the union," they identify no support for the idea that such talismanic words are constitutionally required. *Cf. California v. Prysock*, 453 U.S. 355, 359 (1981) ("*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures."). The fact that a form is required to "authorize" the full dues deductions and to "request and accept membership" in OCSEA leads to the obvious conclusion that joining the union is optional. *Cf. Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 382 (6th Cir. 2005) (holding that although a waiver provision in an arbitration agreement did not specifically refer to relinquishing the right to a jury trial, the fact of entering into an arbitration agreement is consent to the right to forgo a trial because that is the "clear and obvious consequence" of the agreement (internal quotation marks omitted)). In addition, the OCSEA Checkoff Agreement incorporates the CBA[8], which explicitly outlines that the Checkoff Agreement is a voluntary form and that agency fees will be deducted in lieu of full dues if the Checkoff Agreement is not

---

[8] Plaintiffs argue, without citation, that "[a] general reference to a voluminous CBA does not make clear that employees had knowledge of and assented to" the terms of the CBA. (ECF No. 41, at 12.) This argument is frivolous. The OCSEA Checkoff Agreement makes an explicit reference to the CBA. It was Plaintiffs' responsibility to familiarize themselves with the CBA, and they have offered no evidence that they were in any way impeded from doing so. If they did not take the opportunity to review the CBA, that was their choice.

signed. The Court can discern no requirement from the case law that the OCSEA Checkoff Agreement was required to provide the explicit admonition that Plaintiffs seek. *Cf. Cooper v. MRM Inv. Co.*, 367 F.3d 493, 506 (6th Cir. 2004) ("This Court . . . has flatly rejected the claim that an arbitration agreement must contain a provision expressly waiving the employee's right to a jury trial.").

Plaintiffs also criticize the fact that this CBA reference appears in "fine print" in the OCSEA Checkoff Agreement. (ECF No. 20, at 15–16.) In doing so, they cite one case, *Fuentes v. Shevin*, which does not support their criticism. In *Fuentes*, the Supreme Court found that the appellants had not waived their right to due process, not because the rights were outlined in fine print but because there was no evidence that they "were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights" because they had signed "printed form contracts, appearing in relatively small type and unaccompanied by any explanations clarifying their meaning." 407 U.S. 67, 94–95 (1972). That is not the case here, where the "fine print" is explicit and clear, not to mention that it amounts to just a few lines of text. Moreover, key to the *Fuentes* decision was that there was no bargaining over contractual terms in *Fuentes*, and the parties were not equal in bargaining power. 407 U.S. at 95. Here, officers of OCSEA (elected by a vote in which Plaintiffs had a right to participate) bargained with the State on behalf of all members in agreeing to the terms of the CBA. Plaintiffs and their fellow union members then had a right to vote on whether to accept the negotiated CBA. This is a far cry from the unequal bargaining terms present in *Fuentes* that led to the voiding of the contractual agreement.

Finally, Plaintiffs argue that the Maintenance of Membership Requirement prevented them from being able to freely choose whether to pay union dues. If they opposed this

requirement, they had the opportunity to vote against the CBA and to encourage their fellow union members to do the same. Regardless, Plaintiffs agreed to the Maintenance of Membership Requirement when the signed the OCSEA Checkoff Agreement. And "temporarily irrevocable payment authorizations are common and enforceable in many consumer contracts—e.g., gym memberships or cell phone contracts . . . ." *Fisk v. Inslee*, 759 F. App'x 632, 634 (9th Cir. 2019).[9]

The Court agrees with the unanimous post–*Janus* district court decisions holding that employees who voluntarily chose to join a union are bound by the terms of the CBA and cannot renege on their promises to pay union dues.[10] Plaintiffs make two unsuccessful efforts to distinguish these cases. First, they argue that these decisions are unpersuasive because "[n]o one would say that individuals voluntarily purchased a company's services if that company threatened to take the individuals' money if they did not." (ECF No. 41, at 10.) However, this analogy does not accurately describe the circumstances that Plaintiffs faced. Rather, they had a

---

[9] In a similar vein, Plaintiffs argue that the Maintenance of Membership Requirement is legally unconscionable. (ECF No. 41, at 12–13.) They do so without citing to a single case that has held that such a provision, or any other in a CBA, was unconscionable. (*See id.*) This argument is meritless. Under Ohio law, a contract is only unconscionable if one of the parties has an absence of meaningful choice regarding the contract terms. *Lake Ridge Acad. v. Carney*, 613 N.E.2d 183, 189 (Ohio 1993). Plaintiffs had the ability to decline to join the union. Once they decided to join, they had the ability to elect the union officers who negotiated the CBA and had the ability to vote whether to approve the CBA. This is meaningful choice. *Cf. United Auto Workers Local 594 v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. (UAW)*, 956 F.2d 1330, 1338 (6th Cir. 1992) ("Congress unquestionably regarded the desire of unions to maintain control over their own affairs as legitimate.").

[10] *See Campos v. Fresno Deputy Sheriff's Ass'n*, 1:18-CV-1660, 2020 WL 949915, at *7 (E.D. Cal. Feb. 27, 2020); *Loescher v. Minn. Teamsters Pub. & Law Enf't Emps.' Union, Local No. 320*, No. 19-cv-1333, 2020 WL 912785, at *7 (D. Minn. Feb. 26, 2020); *Quirarte v. United Domestic Workers AFSCME Local 3930*, No. 19-CV-1287-CAB-KSC, 2020 WL 619574, at *6 (S.D. Cal. Feb. 10, 2020); *Hendrickson v. AFSCME Council 18*, No. CIV 18-1119, 2020 WL 365041, at *6 (D.N.M. Jan. 22, 2020); *Mendez*, 2020 WL 256124, at *2; *Hernandez v. AFSCME Cal.*, No. 2:18-CV-2419, 2019 WL 7038389, at *6 (E.D. Cal. Dec. 20, 2019); *Smith*, 2019 WL 6647935, at *9; *Smith v. N.J. Educ. Ass'n*, No. 18-10381, 2019 WL 6337991, at *6 (D.N.J. Nov. 27, 2019); *O'Callaghan*, 2019 WL 6330686, at *4; *Anderson v. Serv. Emps. Int'l Union (SEIU) Local 503*, 400 F. Supp. 3d 1113, 1116–17 (D. Or. 2019); *Seager v. United Teachers L.A.*, No. 2:19-cv-00469-JLS-DFM, 2019 WL 3822001, at *2 (C.D. Cal. Aug. 14, 2019); *Cooley v. Cal. Statewide Law Enf't Ass'n*, 385 F. Supp. 3d 1077, 1080 (E.D. Cal. 2019); *Belgau*, 359 F. Supp. 3d at 1016–17; *Smith*, 2018 WL 6072806, at *1.

binary choice from which they voluntarily chose one option over the other. Such choices are omnipresent in daily life.

Second, Plaintiffs argue that those district court decisions are distinguishable because the State of Ohio and OCSEA have had a Maintenance of Membership Requirement in their contracts since 1992. (ECF No. 41, at 11.) The Court does not understand how this distinction favors Plaintiffs. If anything, it cuts against them because it strengthens the case that they should have been aware of the existence of the Maintenance of Membership Requirement when they agreed to join the union and be bound by all of the provisions of the CBA, including this requirement.

Based on the above analysis, the Court concludes that Plaintiffs do not have a strong likelihood of success on the merits of their claims.

It is important to point out that the above analysis relies heavily on the specific language of the OCSEA Checkoff Agreement. The Court thus confines its analysis to the language of that agreement. The Court will not address whether signing the Alternative Checkoff Agreement (or any other) might constitute a valid waiver for three reasons. First, Plaintiffs each signed the OCSEA Checkoff Agreement (and only the OCSEA Checkoff Agreement). Second, while Plaintiffs claim that not all putative class members signed Checkoff Agreements containing the same language as the OCSEA Checkoff Agreement, they provide no information as to how many did not or what language was on the Checkoff Agreements that these individuals signed. As a result, the Court has insufficient information to be able to determine the likelihood of success on the merits with respect to Checkoff Agreements containing alternative language. Third, Plaintiffs' proposed classes are broad in scope and ostensibly include individuals who signed the OCSEA Checkoff Agreement as well as others who did not. Accordingly, the Court cannot grant

preliminary injunctive relief to putative classes containing individuals who the Court concludes have waived their First Amendment rights (i.e., those who have signed the OCSEA Checkoff Agreement) as well as individuals for whom the Court has insufficient information to conduct a waiver analysis.

### 2.    Irreparable Harm

The Court next turns to the second factor in the preliminary injunction analysis, whether Plaintiffs would suffer irreparable harm without the injunction. They would not. Not only have Plaintiffs received all of the monetary relief that they have asked for, but because their dues are no longer being deducted, their asserted harm of funding an organization with which they disagree no longer exists. Moreover, although OCSEA continues to deduct dues from other members of the putative classes, this money is all going into an escrow account. As OCSEA explains, because the money cannot be used by OCSEA, there is no risk of any First Amendment harm. (OCSEA Resp. to Mot. Prelim. Injunction, at 17, ECF No. 37.)

Plaintiffs argue that placing the funds in escrow is an insufficient measure. This is only true "when there are flaws in a union's collection plan" (i.e., when there is a procedural dispute regarding the fee collection process, rather than a substantive dispute regarding the propriety of fee collection). *Weaver v. Univ. of Cincinnati*, 942 F.2d 1039, 1045–46 (6th Cir. 1991). The harm that Plaintiffs assert is that their money will be used to fund an organization and activities to which they object. (*See* ECF No. 20, at 16; ECF No. 41, at 14.) It is impossible for this harm to come to fruition when the money remains untouched in an escrow account.

At the parties' February 7, 2020, conference, Plaintiffs also argued that the Maintenance of Membership Requirement constitutes irreparable harm because it deters union employees from withdrawing from the union and from attempting to cease the dues deductions. This

asserted harm is an imaginary one. As was explained above, members subject to the Maintenance of Membership Requirement affirmatively agreed to it by signing the Checkoff Agreements. And even assuming that the Maintenance of Membership Requirement might deter putative class members from trying to break their contract, it is likely that they have no right to do so in the first place. Forcing members of the putative classes to adhere to the contracts that they signed does not constitute irreparable harm.

Because Plaintiffs do not have a strong likelihood of success on the merits and because there is no risk of irreparable harm, Plaintiffs' motion cannot succeed. It is not necessary to consider the remaining factors in the preliminary injunction analysis. Plaintiffs' Motion for a Preliminary Injunction is **DENIED**.

IV. **CONCLUSION**

For the reasons set forth above, the State Defendants' Motion to Dismiss is **DENIED** and Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**